**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
E-mail: jpafiti@pomlaw.com

**Attorney for Plaintiff**
*- additional counsel on signature page -*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL OTO, Individually and On Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| NVIDIA CORPORATION, JEN-HSUN HUANG, and COLETTE M. KRESS, | |
| Defendants. | |

Plaintiff Michael Oto ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding NVIDIA Corporation ("NVIDIA" or the "Company"),

1

analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired NVIDIA securities between August 10, 2017 through November 15, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. NVIDIA is a computer technology company founded in 1993 and is headquartered in Santa Clara, California. NVIDIA designs and sells graphics processing units ("GPUs") and software, traditionally in the computer gaming market. NVIDIA's business has since expanded to include GPUs used in connection with, *inter alia*, cryptocurrencies. NVIDIA's business in cryptocurrency market, infamous for its growth and volatility, became especially integral to investors.

3. Defendants represented to investors that NVIDIA could competently navigate the cryptocurrency market throughout the Class Period. For example, Defendants assured investors that NVIDIA and its executives are "masters at managing [the Company's] channel" and "understand the channel very well," despite analysts' increasing qualms regarding NVIDIA's inventory management in that market. NVIDIA also consistently downplayed the Company's growing reliance on cryptocurrency-related sales, representing to investors that the

cryptocurrency market made up little of NVIDIA's revenue. Defendants also touted the strong demand for its computer gaming GPUs, assuring investors that NVIDIA's computer gaming customer base would compensate for any decline in revenue from cryptocurrency-related sales.

4.     NVIDIA's shares began to trade at record highs as analysts digested these repeated assurances to investors. Meanwhile, NVIDIA's senior executives were concurrently selling their own shares in significant amounts, including, *inter alia*, Jen-Hsun Huang ("Huang"), NVIDIA's Chief Executive Officer ("CEO"). Huang sold 110,000 personally-held NVIDIA shares during the Class Period, profiting by over $18 million.

5.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the NVIDIA's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) NVIDIA's growth in its gaming GPU revenue was driven, as repeatedly denied by Defendants, in significant part by the spiked demand for those GPUs among cryptocurrency miners; (ii) NVIDIA did not have, as Defendants asserted, visibility into its inventory channel; (iii) NVIDIA was unable to adapt to the volatility of cryptocurrency markets; (iv) as cryptocurrency prices dropped, NVIDIA hid halting growth from cryptocurrency miners by continuing to push mid-range GPUs into the channel; (v) this would foreseeably cause an oversupply of gaming card inventory levels on the market and ultimately lead to over three months of excess inventory in NVIDIA's channel; and (vi) as a result, NVIDIA's public statements were materially false and misleading at all relevant times

6.     On November 15, 2018, NVIDIA disclosed that its revenue would decline by over 7% for the fourth fiscal quarter, sharply cutting its revenue guidance. This was in marked contrast to the 17% growth Defendants had previously led investors to expect. NVIDIA blamed the poor

financial results on lower demand from cryptocurrency-related purchasers, which resulted in an oversupplied inventory of midrange GPUs. This inventory of GPUs had stored up in the channel before cryptocurrency-related demand for NVIDIA's GPUs rapidly declined.

7.    On this news, NVIDIA shares declined by $57.69, or 28.5% over the next two trading sessions.

8.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.    Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  NVIDIA is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

12.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

13.     Plaintiff, as set forth in the attached Certification, acquired NVIDIA securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.     Defendant NVIDIA is a Delaware corporation with its principal executive offices located at 2788 San Tomas Expressway, Santa Clara, California 95051. NVIDIA's common stock trades in an efficient market on The NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "NVDA."

15.     Defendant Huang is, and was at all relevant times, President and CEO of NVIDIA, as well as a member of the Company's Board of Directors.

16.     Defendant Colette M. Kress ("Kress") is, and was at all relevant times, Executive Vice President and Chief Financial Officer ("CFO") of NVIDIA.

17.     The Defendants referenced above in ¶¶ 15-16 are sometimes referred to herein collectively as the "Individual Defendants."

18.     The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being

made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

19.    NVIDIA is a computer technology company founded in 1993 and is headquartered in Santa Clara, California. NVIDIA designs and sells GPUs and software, traditionally in the computer gaming market. A GPU is a kind of computer chip that primarily renders computer images by running rapid calculations. NVIDIA's business has since expanded to include GPUs used in connection with, *inter alia*, cryptocurrencies, especially following a high spike in demand for the Company's GPUs after becoming popular among cryptocurrency "miners."

20.    Cryptocurrency mining is a process by which the public can generate currency, similarly to traded securities, by running complex mathematical calculations on digital tokens, or coins, and was originally accomplished through the use of central processing units ("CPUs"). Cryptocurrency "miners" eventually began to turn to GPUs over CPUs after it became apparent that GPUs worked at higher processing speeds and were generally more efficient.

21.    Capitalizing on the increased attention GPUs were getting from the cryptocurrency market, NVIDIA began manufacturing GPUs specifically designed and marketed towards cryptocurrency "miners." Subsequently, NVIDIA assured investors that NVIDIA's sales from its computer gaming GPUs were driven nearly entirely by its computer gaming customer base, while downplaying the sudden demand by cryptocurrency miners. NVIDIA assured investors it remained focused on the computer gaming segment of its business and that cryptocurrency was but a small portion of its business.

**Materially False and Misleading Statements Issued During the Class Period**

22.     The Class Period begins on August 10, 2017, when NVIDIA issued a press release announcing its financial results for the fiscal second quarter ended July 30, 2017 (NVIDIA runs on fiscal years ending on the last Sunday in January). The press release was filed with NVIDIA's Form 8-K with the SEC, and stated "record revenue . . . of $2.23 billion, up 56 percent from $1.43 billion a year earlier, and up 15 percent from $1.94 billion in the previous quarter." Quoting CEO Huang, the press release attributed the revenue growth to, *inter alia*: "[d]atacenter revenue [that] increased more than two and a half times[,]" "[a] growing number of car and robot-taxi companies [that] are choosing our DRIVE PX self-driving computing platform[,]" and "in Gaming, increasingly the world's most popular form of entertainment, [how the Company] power[s] the fastest growing platforms - GeForce and Nintendo Switch."

23.     On August 10, 2017, NVIDIA also held a conference call with analysts and investors to discuss the Company's earnings and operations, during which analysts questioned NVIDIA's management of volatile cryptocurrency markets. Defendant Huang assured those on the call that "our strategy is to stay very, very close to the market. We understand its dynamics really well." Defendant Huang also assured investors that NVIDIA would not be affected by the volatility of cryptocurrency markets because "the larger of a GPU company you are, the greater ability you could absorb the volatility" and stressed NVIDIA's "ability to rock and roll with this market as it goes."

24.     On September 6, 2017, during NVIDIA's presentation at the Citi Global Technology Conference, Defendant Kress answered a question regarding what steps NVIDIA had taken "to avoid cannibalization of core gaming market" due to increased demand from cryptocurrency miners. Defendant Kress responded that "we covered most of cryptocurrency

7

with our cryptocards that we had developed." Kress also stressed NVIDIA's "ability, given the breadth of GPUs that we already build, to develop GPUs exclusively for cryptocurrency" and NVIDIA's ability "to serve that market quite effectively, and we will serve that market effectively."

25.    On November 9, 2017, NVIDIA issued a press release announcing its financial results for the third quarter ended October 29, 2017. The press release was filed with NVIDIA's Form 8-K with the SEC, and stated "record revenue . . . of $2.64 billion, up 32 percent from $2.00 billion a year earlier, and up 18 percent from $2.23 billion in the previous quarter." Quoting CEO Huang, the press release attributed the revenue growth to, *inter alia*: NVIDIA's "Volta GPU [that] has been embraced by every major internet and cloud service provider and computer maker[,]" NVIDIA's "new TensorRT inference acceleration platform [that] opens [the Company] to growth in hyperscale datacenters[,]" "GeForce and Nintendo Switch[, which] are tapped into the strongest growth dynamics of gaming[,]" and NVIDIA's "new DRIVE PX Pegasus for robotaxis [that] has been adopted by companies around the world."

26.    On November 9, 2017, NVIDIA also held a conference call with analysts and investors to discuss the Company's earnings and operations, during which Defendant Kress stressed that even though "GPU sales . . . benefited from continued cryptocurrency mining[,]" NVIDIA "remain[ed] nimble in [its] approach to the cryptocurrency market." Defendant Kress also assured investors that its cryptocurrency-related business would "not distract [NVIDIA] from focusing on [its] core Gaming market." On the same call, an analyst asked "why should we think that crypto won't impact the gaming demand in the future?" Defendant Huang responded that "[t]he longer-term way to think about that is crypto is small for us but not [zero]." Defendant Huang, while continuing to downplay cryptocurrency mining's importance to NVIDIA's growth,

stressed that "when you think about crypto in the context of our company overall, the thing to remember is that we're the largest GPU computing company in the world. And our overall GPU business is really sizable and we have multiple segments . . . . [C]rypto usage of GPUs will be small but not [zero] for some time."

27.     On November 29, 2017, during NVIDIA's presentation at the Credit Suisse Technology, Media and Telecom Conference, an analyst noted "it was the first time that [NVIDIA] had mentioned cryptocurrency as being partly . . . driving the gaming side of the business." As the analyst pointed out, NVIDIA had first acknowledged that cryptocurrency mining made up a portion of sales of gaming GPUs. Defendant Kress again downplayed cryptocurrency's impact on NVIDIA's gaming business, responding to the analyst's comment by stating that "there probably is some residual amount or some small amount in terms of that . . . [w]e do believe the majority does reside in terms of our overall crypto card."

28.     In early 2018, NVIDIA GPU sales continued to increase as cryptocurrency prices began to decline. NVIDIA attributed this to gamer-consumers' "pent up demand" for affordable GPUs after GPU prices rose because of increased demand from cryptocurrency miners, resulting in inventory constraints. NVIDIA then repeated its message to investors that cryptocurrency mining only made up a small portion of its business. NVIDIA also continued to deny that the Company would be negatively impacted by a declining cryptocurrency market.

29.     On February 8, 2018, NVIDIA issued a press release announcing its financial results for the fourth quarter ended January 28, 2018. The press release was filed with NVIDIA's Form 8-K with the SEC, and stated "record revenue . . . of $2.91 billion, up 34 percent from $2.17 billion a year earlier, and up 10 percent from $2.64 billion in the previous quarter." Quoting CEO Huang, the press release attributed the revenue growth to, *inter alia*: "software developers

working in AI, self-driving cars, and a broad range of other fields [that] continued to discover the acceleration and money-saving benefits of our GPU computing platform."

30.     On February 8, 2018, NVIDIA also held a conference call with analysts and investors to discuss the Company's earnings and operations, during which Defendant Kress stated that NVIDIA "met some of this [cryptocurrency] demand with a dedicated board in our OEM business and some was [met] with our gaming GPUs. This contributed to lower than historical channel inventory levels of our gaming GPUs throughout the quarter." Defendant Kress, while noting that the "overall contribution of cryptocurrency to our business . . . was a higher percentage of revenue than the prior quarter," nonetheless stressed to investors that NVIDIA's "main focus remains on our core gaming market." On the same conference call, Defendant Huang assured investors that "there is a fairly sizable pent up demand [with gamer-consumers] going into this quarter" for NVIDIA GPUs. Later on that call, Defendant Huang also stressed that although the GPU supply "channel[] [is] relatively lean" NVIDIA was "working really hard to get GPU[s] down to the marketplace for the gamers."

31.     On February 26, 2018, during NVIDIA's presentation at the Morgan Stanley Technology, Media & Telecom Conference, an analyst asked why NVIDIA's GPU supplies were constrained and how NVIDIA prioritized sales to meet the constraint. Defendant Kress responded that the "channels had been influenced by not only the strength of the overall gaming that we had seen for the overall holiday season, but also the large uptick that we've seen in the overall valuation of cryptocurrency." Kress highlighted NVIDIA's focus on "mak[ing] sure [] gamers worldwide receive the cards that we want to do." Kress also stressed "we do believe we can serve [cryptocurrency miners] primarily with those specialized cards and that's going to be our goal going forward" and "we're going to really try our hardest to really focus our overall GPUs for

gaming for overall gamers going forward." Thus, Kress again assured investors that GPU sales to gamer-consumers would not be negatively affected by cryptocurrency miners.

32.    On May 10, 2018, NVIDIA issued a press release announcing its financial results for the first quarter ended April 29, 2018. The press release was filed with NVIDIA's Form 8-K with the SEC, and stated "record revenue . . . of $3.21 billion, up 66 percent from $1.94 billion a year earlier, and up 10 percent from $2.91 billion in the previous quarter." Quoting CEO Huang, the press release attributed the revenue growth to, *inter alia*:  NVIDIA's "datacenter business [that] achieved another record and [that] gaming remained strong."

33.    On May 10, 2018, NVIDIA also held a conference call with analysts and investors to discuss the Company's earnings and operations, during which Defendant Huang again stressed to investors that NVIDIA's sales of gaming GPUs were not driven by cryptocurrency miners. Specifically, Defendant Huang stated "we try to as transparently review our numbers as best we can. Our strategy is to create a SKU that allows the crypto miners to fulfill their needs . . . . And to . . . as much as possible, fulfill their demand that way."

34.    On May 16, 2018, during NVIDIA's annual shareholder meeting, Defendant Huang again downplayed cryptocurrency mining's importance to NVIDIA's growth, stating: "Ethereum and crypto mining is a recent GPU application. It is a bonus in our business, but volatile. It's not really a factor in our core business. We have great growth drivers without crypto." Defendant Huang further stressed to investors that "[o]ur core gaming business – our core businesses in gaming and high-performance computing and artificial intelligence and in self-driving cars are doing so well that with or without crypto mining, we have a growth – we have a wonderful growth business behind us."

35.     The statements referenced in ¶¶ 22-27 and 29-34 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) NVIDIA's growth in its gaming GPU revenue was driven, as repeatedly denied by Defendants, in significant part by the spiked demand for those GPUs among cryptocurrency miners; (ii) NVIDIA did not have, as Defendants asserted, visibility into its inventory channel; (iii) NVIDIA was unable to adapt to the volatility of cryptocurrency markets; (iv) as cryptocurrency prices dropped, NVIDIA hid halting growth from cryptocurrency miners by continuing to push mid-range GPUs into the channel; (v) this would foreseeably cause an oversupply of gaming card inventory levels on the market and ultimately lead to over three months of excess inventory in NVIDIA's channel; and (vi) as a result, NVIDIA's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

36.     On August 16, 2018, NVIDIA lowered its revenue guidance by over 2% for the third quarter of 2018. NVIDIA also disclosed its bleak expectations for any meaningful growth from cryptocurrency miners by the year's end. NVIDIA also revealed that its GPU inventory had ballooned by over 30% from the previous quarter.

37.     As a result of these disclosures, investors feared slowing demand for NVIDIA's GPUs, and NVIDIA shares declined by $12.62 per share, or 4.9%.

38.     NVIDIA again failed to properly address investor concerns regarding decreased demand for the Company's GPUs, despite recent disclosures. On August 16, 2018, during a conference call with analysts and investors, Defendant Huang attributed its ballooning

12

inventories to the launch of its new GPU product, which featured NVIDIA's "Turing Architecture." Defendant Huang told investors that the overstocked inventory would "work itself out" and NVIDIA was "not concerned about the channel inventory." Defendant Huang further stressed that "[w]e are masters at managing our channel, and we understand the channel very well."

39.    The statements referenced in ¶ 38 were materially false and misleading for the same reasons as alleged in items (i)-(vi) in ¶ 35.

40.    On November 15, 2018, NVIDIA disclosed that its revenue would decline by over 7% for the fourth fiscal quarter, sharply cutting its revenue guidance. This was in marked contrast to the 17% growth Defendants had previously led investors to expect. NVIDIA blamed the poor financial results on lower demand from cryptocurrency-related purchasers, which resulted in an oversupplied inventory of midrange GPUs. This inventory of GPUs had stored up in the channel before cryptocurrency-related demand for NVIDIA's GPUs rapidly declined. As a result, NVIDIA revealed it would not ship any of its mid-range GPUs into the channel for at least an entire quarter.

41.    Analysts immediately questioned Defendants' credibility, pointing out that these disclosures were in stark contrast to NVIDIA's prior representations concerning how cryptocurrency miners impacted the Company's business. These disclosures also directly contradicted NVIDIA's touted ability to navigate a volatile cryptocurrency market. BMO Capital Markets analysts noted that "[t]he large shortfall in guidance due to a bloated channel due to crypto-currency is in sharp contrast to the comments around channel inventory from the company." Other analysts also questioned NVIDIA's ability to relieve its bloated inventory in one quarter alone, noting it could take up to three quarters to resolve.

42.     Following these disclosures, NVIDIA shares fell sharply by $57.69, or 28.5%, over the next two trading sessions, wiping out over $35 billion in shareholder value.

**Loss Causation**

43.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of NVIDIA stock and operated as a fraud or deceit on the Class (as defined below). Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on August 16, 2018 and November 15, 2018 the price of NVIDIA stock fell. As a result of their purchases of NVIDIA stock during the Class Period, Plaintiff and other members of the Class suffered harm.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

44.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the Company's securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

45.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of

the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

46.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

47.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

48.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of the Company;

- whether the Individual Defendants caused the Company to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

15

49.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

50.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- •       Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- •       the omissions and misrepresentations were material;

- •       the Company's securities are traded in an efficient market;

- •       the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

- •       the Company traded on the NASDAQ and was covered by multiple analysts;

- •       the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- •       Plaintiff and members of the Class purchased, acquired and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

51.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

52.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material

information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

53.     Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

54.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

55.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.   Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of the Company's securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire the Company's securities and options at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

56.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for the Company's securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company's finances and business prospects.

57.   By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

58.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of the Company's internal affairs.

59.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of

the Company.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of the Company's securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning the Company's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired the Company's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

60.   During the Class Period, the Company's securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of the Company's securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of the Company's securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.   The market price of the Company's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

61.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

62.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

63.     Plaintiff repeats and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

64.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of income and expenses and false financial statements.

65.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

66.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press

releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

67.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

68.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

**<u>DEMAND FOR TRIAL BY JURY</u>**

Plaintiff hereby demands a trial by jury.

Dated:  December 28, 2018                    Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jennifer Pafiti*

Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
E-mail: jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Jonathan Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        jlindenfeld@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***

22

**Submission Date**

2018-12-24 10:45:16

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.   I make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against NVIDIA Corporation ("NVIDIA" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire NVIDIA securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired NVIDIA securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my transactions in NVIDIA securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

## Name

**Print Name**

Michael Oto

## Acquisitions

**Configurable list (if none enter none)**

| Date Acquired | Number of Shares Acquired | Price per Share Acquired |
|---|---|---|
| 11/12/2018 | 50 | 190.75 |

## Sales

## Documents & Message

**Upload your brokerage statements showing your individual purchase and sale orders.**



(redacted)



**Full Name**

Michael Oto

(redacted)

**NVIDIA Corporation (NVDA)**                                              **Oto, Michael**

### List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|----------------------|---------------------|
| 11/12/2018 | Purchase | 50 | $190.7500 |

**NVIDIA Corporation (NVDA)**                                                    **Oto, Michael**

### List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|-----------------------|----------------------|

**NVIDIA Corporation (NVDA)**                                                                                          **Oto, Michael**

### List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
| --- | --- | --- | --- |